**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

UNITED STATES OF AMERICA,    :

    :

    Plaintiff,    Criminal Action No. 3:07-cr-267 (FLW)

    :

    v.    :

    :

WAYNE R. BRYANT;
R. MICHAEL GALLAGHER,    :

        **OPINION**

    Defendants.    :

---

**WOLFSON, United States District Judge**:

    This matter comes before the Court upon separate motions by Defendants Wayne Bryant ("Bryant") and Michael Gallagher ("Gallagher"), seeking a judgment of acquittal under Fed. R. Crim. P. 29 on all Counts of the Indictment that were tried before this Court. Counts 1-6 allege that Bryant and Gallagher engaged in a scheme to defraud the New Jersey public of Bryant's honest services, in violation of 18 U.S.C. §§1341, 1343, and 1346. Count 7 charges that Bryant solicited and accepted a corrupt thing of value involving an organization receiving federal funds in violation of 18 U.S.C. §666(1)(A). Count 8 charges Gallagher with offering and accepting a corrupt thing of value involving an organization receiving federal funds in violation of 18 U.S.C. §666(1)(B). Counts 9-13 charge Bryant with mail fraud in violation of 18 U.S.C.

1

§1341 in connection with Bryant's scheme to defraud the New Jersey Division of Pensions and Benefits of money and property. A jury found Bryant guilty on Counts 1-7 and 9-13 and Gallagher guilty of Counts 1-3, 5, 6, and 8. Alternatively, both Defendants seek a new trial pursuant to Fed. R. Crim. P. 33. The Court has reviewed the parties' submissions, and for the reasons stated below, Defendants' Motions are denied.

## I. FACTUAL BACKGROUND

The Court will give a brief summary of the Government's allegations. Defendants were indicted on March 29, 2007.[1] In Counts 1-6 of the Indictment, it is alleged that Bryant, a New Jersey State Senator from 2002 through 2006, and Gallagher, Dean of the School of Osteopathic Medicine ("SOM"), a school within the University of Medicine and Dentistry of New Jersey ("UMDNJ"), engaged in a scheme to defraud the New Jersey public of Bryant's honest services as a State Senator. Specifically, Defendants were alleged to have entered into a corrupt quid pro quo bribery arrangement whereby Gallagher hired Bryant for a "low-show" job at SOM, earning Bryant a salary, performance bonuses, and a credit towards his state pension, in exchange for Bryant's assistance and efforts as a State Senator to secure additional funding and other

---

[1]The Indictment, as returned, included an additional count of mail fraud against Bryant arising from a position he held with Rutgers University School of Law-Camden, and six additional fraud counts against Gallagher arising from bonuses he received from SOM under the faculty practice plan. This Court, in an Opinion dated June 5, 2008, 556 F. Supp. 2d 378, dismissed the mail fraud count against Bryant; the six SOM counts, Counts 15-20 of the Indictment, against Gallagher were severed.

benefits from the State of New Jersey for SOM.  Count 7 charges Bryant with violating 18 U.S.C. § 666(a)(1)(A), alleging that he solicited a paid position at SOM with the intent to be influenced by his salary and benefits at SOM. Count 8 charges Gallagher with violating 18 U.S.C. § 666(a)(1)(B), alleging that Gallagher offered and agreed to give Bryant a position at SOM and a series of corrupt payments intending to influence Bryant's actions as a New Jersey State Senator.  As to Counts 9-13, Bryant was alleged to have sought out multiple public jobs, including a position at SOM in an effort to fraudulently inflate his pension benefits from the New Jersey Division of Pensions and Benefits (the "Division").  These counts also allege that Bryant, in his position with the Gloucester County Board of Social Services ("GCBSS"), a position he had held since early nineties, fraudulently submitted to the Division time reports that grossly exaggerated the amount of work Bryant did on behalf of GCBSS.

Over the course of an eight week trial commencing on September 8, 2008, the Government presented a number of witnesses and introduced documentary evidence which it contends demonstrate that Defendants were engaged in an elaborate scheme to use Bryant's position in the State Senate to further the purposes of SOM. On November 18, 2008, the jury found Bryant guilty on Counts 1-7 and 9-13 and Gallagher guilty on Counts 1-3, 5,6, and 8.  The jury acquitted Gallagher on Count 4 of the Indictment, which charged Gallagher with honest services mail fraud arising from Bryant's 2003 mailing of his Legislator's Financial Disclosure Statement.  On October 20, 2008, at the end of the Government's case-in-chief, Defendants both moved for a judgment of acquittal under Fed. R. Crim. P. 29 ("Rule 29").  The Court heard

arguments at that time from counsel but reserved decision pursuant to <u>Fed. R. Crim. P.</u> 29(b). At the close of all the evidence at trial, both Defendants renewed their Rule 29 motions, and the Court again reserved decision. Now, both Defendants move for judgment of acquittal under Rule 29(c), or alternatively, for a new trial pursuant to <u>Fed. R. Crim. P.</u> 33 ("Rule 33").

## II. DISCUSSION

### A. Rule 29 Motion for a Judgment of Acquittal

According to Rule 29(a) of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, a court may reserve its decision on a Rule 29 motion until after the jury has reached a verdict. If so, the court still must decide the motion on the basis of the evidence at the time the ruling was reserved. <u>United States v. Brodie</u>, 403 F.3d 123, 133 (3d Cir. 2005). Hence, this Court must decide Defendants' Rule 29 motions based on the evidence at the end of the Governement's case in chief. <u>See</u> <u>Id.</u> at 134.

A Rule 29 motion requires a court to determine whether the government's evidence is sufficient, or stated another way, whether the record contains " substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." <u>United States v. Lore</u>, 430 F.3d 190, 203-04 (3d Cir. 2005); <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002); <u>United States v. Wolfe</u>, 245 F.3d 257, 261 (3d Cir. 2001). In weighing the evidence presented, the court must "review the record in the light most

favorable to the prosecution," resolving all credibility determinations in the government's favor. Wolfe, 245 F.3d at 261; see also United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984) (court must look at the evidence presented by the Government taken as a whole).

Indeed, "[c]ourts must be ever vigilant in the context of Fed. R. Crim. P 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Brodie, 403 F.3d at 133 (citations omitted); United States v. Carmichael, 269 F. Supp. 2d 588, 595 (D.N.J. 2003) ("The defendant must also overcome the jury's special province in evaluating witness credibility and conflicting testimony"). That being said, a finding that the government's evidence is insufficient is reserved to those exceptional "cases where the prosecution's failure is clear," making "[t]he burden on a defendant who raises a challenge to the sufficiency of the evidence. . .extremely high." Smith, 294 F.3d at 476 (discussing post-trial Rule 29 motion); United States v. Serafini, 233 F.3d 758, 770 (3d Cir.2000) (same). The Court is obligated to "'draw all reasonable inferences in favor of the jury's verdict.'" Smith, 294 F.3d at 476 (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996)).

**B. Rule 33 Motion for a New Trial**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The authority to grant a new trial pursuant to Rule 33 is limited to those instances where the Court "believes that  there is a

5

serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal citations and quotations omitted); United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008).  Even in those cases where the court may feel that the verdict is contrary to the weight of the evidence, "[m]otions for a new trial based on the weight of the evidence are not favored" and should be limited to "exceptional cases." Silveus, 542 F.3d at 1005 (quoting  Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).  However, if there is a reasonable possibility that a "trial error had a substantial influence on the verdict," a new trial must be granted.  Virgin Islands v. Commissiong, 706 F. Supp. 1172, 1184 (D.V.I.1989) (quoting United States v. Mastro, 570 F. Supp. 1388, 1390 (E.D.Pa. 1983); Government of Virgin Islands v. Bedford, 671 F.2d 758, 762 (3d Cir. 1982)).

Besides challenging the sufficiency of the evidence in his Rule 33 Motion, Gallagher contends several discrete errors warrant a new trial.  First, Gallagher asserts that the Government introduced false testimony with regards to SOM's pension policy and later attributed that erroneous understanding of the pension policy to Gallagher.  Second, Gallagher further contends that the Government commented on the fact that he did not testify, permitting the jury to draw adverse and improper inferences from this fact, in violation of Gallagher's Fifth Amendment right not to testify.  These errors, as stated supra, must have had a "substantial influence on the verdict" for this Court to grant a new trial.

### C. Counts 1-6

6

## a. **Quid Pro Quo** Arrangement

Initially, Defendants challenge the sufficiency of the evidence with respect to the alleged quid pro quo arrangement between Bryant and Gallagher, arguing that the Government failed to present sufficient evidence from which a rational jury could conclude that Gallagher, in hiring Bryant, intended to influence Bryant's official actions as a State Senator.  Instead, both Defendants argue, although the evidence may show that Bryant did in fact take official acts that were beneficial to SOM, the evidence does not demonstrate a causal link between Bryant's position at SOM and the benefits he received while employed by SOM.

The elements of honest services fraud were recently set forth by the Third Circuit:

> To prove mail fraud, the government must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails ... in furtherance of the scheme." United States v. Antico, 275 F.3d 245, 261 (3d Cir.2001). Congress has clarified that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Honest services fraud, in turn, typically occurs in either of two situations: "(1) bribery, where a [public official] was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." Antico, 275 F.3d at 262-63.

United States v. Kemp, 500 F.3d 257, 279 (3d Cir. 2007).   As alleged, the Indictment charged Defendants under both theories, failure to disclose and bribery.  However, this Court struck those allegations that charged Defendants under the failure to disclose theory, holding "[b]ecause the conflict that the Indictment alleges that Bryant failed to disclose is the quid pro quo bribery arrangement, a jury could not convict Defendants under the failure to disclose theory without already finding that the Defendants

7

committed <u>quid</u> <u>pro</u> <u>quo</u> bribery." 556 F. Supp. 2d at 421. Thus, "the Indictment's failure to disclose theory is not an alternative means by which Defendants committed honest services fraud; it is the same theory of criminal liability stated in different language." <u>Id.</u> At trial, the Government proceeded on a bribery theory, only.

In distinguishing between a bribery and a gratuity, the Supreme Court has stated that "[b]ribery requires 'intent to be influenced' in an official act. . .In other words, for bribery there must be a <u>quid</u> <u>pro</u> <u>quo</u>-a specific intent to give or receive something of value <u>in exchange</u> for an official act." <u>United States v. Sun-Diamond Growers of California</u>, 526 U.S. 398, 404-05 (1999) (emphasis in original). To prove a <u>quid</u> <u>pro</u> <u>quo</u> bribery arrangement, the Government must establish "that the benefit was offered in exchange for the official act." <u>Kemp</u>, 500 F.3d at 281 (quoting district court's jury instruction on bribery charge). However, the Government is not required to present evidence that attributes each official action to a corrupt payment. It is enough for the government to present "evidence that shows a 'course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor.'" <u>Kemp</u>, 500 F.3d at 282 (quoting <u>United States v. Jennings</u>, 160 F.3d 1006, 1014 (4th Cir. 1998)). Thus, "payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." <u>Id.</u> at 281. The evidence of a "<u>quid</u> <u>pro</u> <u>quo</u> can be implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official

capacity." <u>United States v. Antico</u>, 275 F.3d 245, 257 (3d Cir. 2001).

Based on the evidence presented at trial, a reasonable jury could conclude beyond a reasonable doubt that the timing of Bryant's official actions, which Defendants concede benefitted SOM, and his receipt of a pensionable salary and benefits were not mere coincidence.  Contrary to Defendants' claims, the record contains evidence which demonstrates that Defendants sought to engage in a <u>quid</u> <u>pro quo</u> arrangement where Bryant would be hired by SOM and compensated for prospective official actions taken in his capacity as a New Jersey Senator.  For instance, Robert Prodoehl, Director of Operations at SOM and later Gallagher's Chief of Staff, testified at length that Gallagher was concerned about the amount of state funding that SOM received, especially in light of what Gallagher perceived to be State Senator George Norcross's work for Cooper Hospital.  3 T 105.   Prodoehl further testified that when he discussed Bryant's hiring with Gallagher, Gallagher "was concerned that [Bryant] would – if [SOM] did not hire him, that he would work for Cooper; and he also stated we needed him on our side for our team."  3 T 102.

With respect to the parameters of Bryant's job at SOM, the Government presented testimony and documentary evidence from which a jury could infer that Bryant's primary duty was to secure additional funding for SOM.  John W. Crosbie, Director of Strategic Planning Program Development at SOM, testified that he took part in a meeting with Defendants nine days after Bryant was hired, March 25, 2003, where Defendants discussed SOM's "supplemental funding," a strategy to be spearheaded by Bryant.  6 T 101-02 ("[W]e talked about a supplemental funding strategy; and at that

time we discussed with the senator the opportunity to get supplemental funding in the upcoming budget that was then under way as what we would call a "Christmas tree item" or some people call it "pork barrel" – whatever you want to call it, an item added to the budget at the end of the process."); Government Trial Exhibit (GTX) 304 (Crosbie's memo entitled "Honorable Wayne Bryant, Mach 25th meeting on Projects and Responsibilities" recounting March 25, 2003 meeting). During this meeting, Crosbie testified that Gallagher addressed his concerns about the lack of state funding for SOM, to which Bryant replied that he needed "supporting information that would allow him to pursue supplemental funding on behalf of the school in the budget cycle." 6 T 101-06.

The Government also demonstrated through several witnesses and documentary exhibits that prior to the March 25th meeting, the process surrounding the creation of the position at SOM and Bryant's predetermined hiring were indicative of the alleged scheme to defraud New Jersey of Bryant's honest services.   Specifically, Prodoehl testified that months before candidates were interviewed for the position of Program Support Coordinator, Gallagher had already determined that Bryant was to be hired and sketched out several of his responsibilities.  3 T 139 (testifying that he received notes from Gallagher concerning Bryant's job description in December 2002); GTX 201 (Gallagher's December 2002 notes).   Prodoehl also testified that Gallagher was instrumental in determining what was to be included in the public job description for Program Support Coordinator, and that throughout the hiring process, Gallagher was "excited" to have Bryant start at SOM and expressed that Bryant's hiring needed to

happen quickly.  3 T 179.

When it finally came time to interview candidates, only two were chosen for interviews.  Bryant's interview, however, was "to provide a paper trail, and [Gallagher] concurred with that," given that Gallagher had already determined he wanted to hire Bryant in December 2002 at a salary of $35,000. 3 T 170-72.  In fact, the Government was able to demonstrate through Prodoehl's testimony that Gallagher had already signed off on the agreed-upon salary, $35,000, for Bryant, before Bryant had even interviewed for the position.  3 T 175-76; GTX 212 (Affirmative Action Form dated February 20, 2003, detailing the $35,000 salary Bryant was to receive).  The fact that Gallagher had represented to Prodoehl that Bryant was only to work 7.5 hours a week, see 3 T 158, otherwise known as a .2 employee, which would not qualify Bryant for a $35,000 salary, and the fact that Gallagher signed off on Bryant's hiring at a salary of $35,000, could support a finding that Defendants had agreed to a certain salary, $35,000, and that certain misrepresentations needed to be made to ensure Bryant did indeed receive that amount in pay.  In other words, Defendants backed into this decision to preserve the quid in their quid pro quo arrangement: Bryant's $35,000 pensionable salary, in exchange for his official influence in Trenton.

Further, several other witnesses, including Prodoehl, testified that once Bryant was awarded the position, he rarely was at his SOM office, a fact that underscores the Government's contention that Bryant was being paid for his influence and power in Trenton and not for the duties he undertook as Program Support Coordinator.  Indeed, the testimony tends to demonstrate that Bryant's efforts at SOM could not possibly

justify his $35,000 salary, which required that he work a total of 22.5 hours a week. 6 T 28.  Certainly, the jury could infer from this evidence that the hiring process was one  part of the corrupt arrangement between Bryant and Gallagher.

The Government also presented overwhelming evidence of those official acts taken by Bryant that it claims were influenced by his salary at SOM.  David Rosen and George LeBlanc, state legislative employees, testified that Bryant was responsible for a change in the state's 2003-04 budget which called for a $2.325 million carve-out for SOM.  8 T 36-37; 9 T 92; GTX 14q.  Prodoehl testified that Gallagher recognized that this unprecedented additional funding was a direct result of Bryant's employment at SOM. 4 T 14.   In fact, upon hearing the news, Gallagher quipped that it was a "great return on [its] investment" in Bryant's SOM salary.  Id.  The Government also highlighted other official acts taken by Bryant, specifically $200,000 in funding for SOM's Institute for Successful Aging sometime in the fall of 2005.  See GTX 909, 910. According to Dr. Thomas Cavalieri, Director of the Institute for Successful Aging, Gallagher informed him that the additional funding was, as Gallagher put it, "payback time."  11 T 9.  Given these acts and others described at trial, the jury was entitled to find that Bryant was influenced by the salary he received at SOM.  See United States v. Holck, 398 F. Supp. 2d 338, 348-51 (E.D. Pa. 2005) (finding that jury could infer from official action that benefitted the defendant  that it was in return for favorable loans made to the public official).

Defendants further assert that the evidence merely demonstrates that  Bryant's official acts and his employment at SOM were close in time, and thus, insufficient to

sustain their convictions. Nevertheless, the Third Circuit has recently noted that the close proximity of official acts and alleged corrupt payments is relevant:

> As to the bribery theory, Chartock gave Mariano three separate payments, each of which occurred in close proximity to Mariano acting on behalf of Erie Steel. See United States v. Kemp, 500 F.3d 257, 281 (3d Cir.2007) (holding that bribery requires " 'a specific intent to give or receive something of value in exchange for an official act,' " and extends to agreements to provide a "stream of benefits" in exchange for official acts (quoting United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-05 (1999) (emphasis in original)). Thus, a rational trier of fact could have concluded that Mariano accepted the "stream of benefits" in exchange for the official acts he took to benefit Erie Steel, including his assistance on the Air Management Services and KOZ program matters.

United States v. Mariano, No. 06-3398, 2008 WL 2470911, at *3 (3d Cir. Jun. 20, 2008) (upholding defendant's bribery conviction for honest services fraud).   Here, the Government did show that shortly after the 2003-2004 budget was passed, Bryant received a $5,000 bonus.  6 T 136. Crosbie further testified that the bonus, ordered by Gallagher, was prompted by the additional funding SOM was to receive under the State's 2003-2004 budget. 6 T 135-36.   Hence, the fact that the Government was able to identify several favorable official actions that took place during Bryant's employment at SOM while receiving a stream of payments in the form of salary and bonuses is highly probative and a jury could infer from this evidence that Defendants were engaged in a scheme to defraud New Jersey of Bryant's honest services.

Finally, Gallagher's argument that the jury could not find that Defendants agreed to engage in a scheme to defraud the State of New Jersey of Bryant's honest services is unconvincing.  To the contrary, a sensible jury could infer from the March 25, 2003 meeting that Defendants were working in concert to ensure that SOM would receive

additional state funding at the expense of other worthwhile funding programs in the State.  The Government highlighted the March 25th meeting and its objectives: (1) to inform Bryant that SOM was in desperate need of additional funding; and (2) outline Bryant's main responsibility at SOM, to secure that additional funding.   The Government introduced sufficient evidence to buttress its theory, including Crosbie's testimony concerning Gallagher's desire to receive "[a]ppproximately $2 million a year" in additional funding per student, a number Crosbie subsequently gave to Bryant in May 2003.  6 T 111-12.  Based on the evidence, the jury was free to find that Defendants  were engaged in a scheme within the context of honest services fraud.

Taken as a whole, the  record permits a reasonable jury to infer that there was an understanding, or at the very least, an implied understanding, between the Defendants, that is, Gallagher hired Bryant primarily to secure additional funding for SOM.  It may be the case that Bryant would have taken many of the official acts scrutinized at trial regardless of his position at SOM, i.e. $800,000 for the CARES Institute. However, the jury need not find that the SOM salary was the sole impetus for Bryant's actions; a conviction for honest services fraud may be sustained so long as there is sufficient evidence in the record for the jury to conclude that the public official intended to be influenced in exchange for a stream of corrupt payments. Bryant, 556 F. Supp. 2d at 388-89 (citing Kemp, 500 F.3d at 281). Thus, Defendants' argument that the evidence is insufficient to support a finding of honest services fraud bribery is unavailing as the record contains testimony and documentary exhibits that would allow a jury to infer that Bryant exchanged his independence in performing his official

14

duties as a New Jersey State Senator for a series of payments in the form of a salary and benefits at SOM.

### b. Gallagher's State of Mind

Turning to Gallagher's contention that the Government failed to proffer sufficient evidence of his <u>mens rea</u> to sustain his conviction, the Government identifies several pieces of evidence and testimony that it argues were sufficient for a jury to conclude that Gallagher willfully committed honest services fraud. Gallagher maintains, however, that he understood his conduct to be lawful, that is, he believed that the hiring of Bryant was proper given the representations made by UMDNJ officials, namely Vivian Sanks-King, former UMDNJ General Counsel, and Dr. Stuart Cook, UMDNJ's former president.

At the outset, the Court notes that the Government need not prove criminal intent with direct evidence. Indeed, it is often the case in these types of prosecutions that criminal intent is proved through circumstantial evidence. <u>See</u> <u>United States v. McKee</u>, 506 F.3d 225, 235 n.9 (3d Cir. 2007); <u>see also</u> <u>United States v. Pearlstein</u>, 576 F.3d 531, 541 (3d Cir. 1978) ("In the absence of direct evidence, however, the requisite knowledge and intent can be demonstrated circumstantially, and where sufficient circumstantial evidence is presented, a jury may properly infer that the defendants were culpably involved with, and knowingly furthered, the fraudulent scheme.") (citation omitted). Hence, a jury may infer criminal intent from direct or indirect evidence that tends to show, for example, consciousness of guilt or similarly, misrepresentations and false statements known to the defendant. At trial, the jury found, in accordance with this

Court's jury instruction, that Gallagher knew that his conduct was unlawful.

This finding was based on testimony and documentary evidence submitted by the Government, including several damaging statements Gallagher made to other SOM officials and evidence of other acts taken by Gallagher the Government proffered were done to conceal the Defendants' arrangement.  For instance, upon overhearing Prodoehl and Connie Spencer, an SOM staffer, discussing the $200,000 MAC account grant in the office, "Dr. Gallagher. . .just exploded on Connie, told her she was stupid. You couldn't have a conversation like that in a public area like that." 4 T 48.  Again, in 2005, the Government demonstrated, through Crosbie's testimony, that Gallagher instructed Crosbie to "make sure we had a calender that reflected the senator's time on campus" even though such a calender had not been kept previously and that the time entries ultimately created were not "an accurate representation of Senator Bryant's time at SOM." 6 T 149.

More importantly, the Government introduced evidence that Gallagher falsified certain documents to ensure Bryant's employment with SOM would qualify Bryant for additional benefits, including a salary of $35,000, from which, the Government contends, the jury could infer that Gallagher knew his conduct to be unlawful. Specifically, Wendy McCrann, an administrative assistant at SOM, testified that when she asked Tom Walsh, SOM's CFO and her supervisor, how she should complete the SPTF form for Bryant's employment, "he grabbed one of these pens I had, and a Post-it note, and went walking into Dr. Gallagher and came back 10, 15, 20 minutes later, I don't know, and he said: Here . And he handed it to me.  Here are your numbers."

16

5 T 146.  The note, McCrann further testified, stated that Bryant was to receive 0.6, or three days a week, and 22.5 hours a week, qualifying Bryant for a pensionable salary of $35,000 a year. Id.  Without that, Gallagher stated, albeit incorrectly, Bryant would be unable to obtain credit towards his state pension.  6 T 148.

Notwithstanding Gallagher's misinterpretation of pension eligibility, the Government contends that the $35,000 a year that Bryant was to receive in salary required that he be classified as a .6 employee, a contention buttressed by the testimony.  6 T 28 (Moss testifying that .6 employment was consistent with $35,00 salary "[b]ecause if we are doing a .2 calculation, certainly, it would be less, you know, this .6 figure, so one-third of that.").  Thus, Gallagher's actions, in changing Bryant to a .6, would be demonstrative of his intent to ensure that Bryant received a $35,000 salary, what the Government argues was an integral part of Defendants' corrupt arrangement.[2]

While the record reveals that certain UMDNJ officials explicitly approved Bryant to be hired as a Program Support Coordinator, the  testimony also indicates that approval did not extend to a position in which Bryant would be paid to obtain state funding for SOM.  6 T 22 (Del Moss, Director of Compensation and Benefits at SOM, testifying that her approval would not be given for such a job as it was not in Bryant's

---

[2]The testimony could also be interpreted to reflect that Bryant needed the .6 position to earn $35,000 – and credit the $35,000 towards his pension, thus inflating Bryant's "high tree" years of earnings for pension purposes.  This is consistent with the evidence that Bryant sought out a position with UMDNJ and asked that his salary be $35,000.  The testimony supported the notion that Bryant was not simply looking for a salary but an enhanced pension.

job description as provided to UMDNJ officials).  Indeed, neither Vivian Sanks-King nor Dr. Stuart Cook <u>actually</u> approved Bryant's hiring in terms of the position he ultimately was awarded at SOM.  During her testimony, Sanks-King admitted that when asked by Dr. Cook if it were permissible for UMDNJ to hire an incumbent state legislator, she "was looking just for the threshold question of whether a sitting legislator could in fact be hired by a public university," and not with respect to a specific position and a specific candidate, in this case, Bryant.   8 T 17-18.   With respect to Dr. Cook, Gallagher distorts the extent to which Dr. Cook "approved" Bryant's hiring for a position within the UMDNJ system.  After Bryant had solicited a position at UMDNJ in a private meeting with Dr. Cook, an admittedly angry Dr. Cook informed Bryant that he had no openings in Newark for him.  2 T 20-21 ("I was quite upset about that.").  Thus, when asked by others at UMDNJ if Bryant <u>could</u> be hired, namely King, George Hampton, and Larry Feldman, Dr. Cook informed them that he would not oppose such a hiring so long as (1) the job was legal; (2) the job was legitimate; and (3) Bryant was the most qualified person for the job.   Nowhere in his testimony did Dr. Cook state that, while looking at the job description drafted by Gallagher, he approved Bryant's hiring. 2 T 22-24.

Finally, with respect to what he stood to receive from Bryant's employment at SOM, Gallagher understates what the evidence revealed at trial.  The Government introduced sufficient evidence for the jury to find that Gallagher could personally benefit from his relationship with Bryant, including performance-based bonuses at SOM, performance benchmarks that would be undoubtedly easier to reach with

additional state funding. GTX 116. Indeed, the evidence tends to show that Gallagher derived intangible benefits from his arrangement with Bryant as well, specifically support in his bid to become UMDNJ president in 2006.  GTX 138.  In light of that evidence, a jury could find that Gallagher stood to considerably gain from Bryant's efforts.

Ultimately, the record is replete with evidence from which the jury could infer that Gallagher not only crafted Bryant's <u>actual</u> duties but worked vigorously to conceal the corrupt nature of the arrangement.  Certainly, a reasonable jury could, after hearing about his acts of concealment and misrepresentations, also find that Gallagher was well aware that hiring Bryant to take official actions for SOM was unlawful.  While Gallagher argues that the jury <u>could</u> have reasonably inferred from the evidence presented that he acted in good faith, namely that he relied on the opinion and confirmation of his superiors at UMDNJ, "[t]here is no requirement ... that the inference drawn by the jury be the only inference possible or that the government's evidence forecloses every possible innocent explanation."  <u>United States v. Chartock</u>, 283 Fed.Appx. 948, 955 (3d Cir. 2008) (quoting <u>United States v. Iafelice</u>, 978 F.2d 92, 97 n. 3 (3d Cir.1992)).

In <u>Chartock</u>, the defendant, charged with honest services fraud, advanced a similar argument, stating that his alleged acts of concealment were as consistent with non-criminal motives as they were with the criminal intent necessary to sustain a conviction.  In affirming the district court's denial on the defendant's Rule 29 motion, the Third Circuit held that the Government had presented sufficient evidence, albeit

indirect, that the defendant's acts of concealment were done to assist the public official in avoiding the requirements to disclose a conflict of interest and that "[t]he jury was clearly justified in rejecting this alternative explanation of the evidence." Id. at 954-55; see also Pearlstein, 576 F.3d at 541 ("In the absence of direct evidence. . .the requisite knowledge and intent can be demonstrated circumstantially, and where sufficient circumstantial evidence is presented, a jury may properly infer that the defendants were culpably involved with, and knowingly furthered, the fraudulent scheme.") (internal citations omitted). Here, evidence showing that Gallagher created a paper trail, including a falsified SPTF form and work calender for Bryant,[3] was sufficient for a jury to find that Gallagher knew his conduct was unlawful.

### D. Counts 7-8

Defendants were also convicted of Counts 7 and 8 which charge violations of 18 U.S.C. § 666, which provides, in pertinent part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists-
>
> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof-
>
> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that-
>
> (i) is valued at $5,000 or more, and

---

[3]As to Gallagher's mental state, the Government identifies other evidence that is of import, including testimony that the hiring process for the position Bryant ultimately received was a pre-arranged sham. See supra.

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

18 U.S.C. § 666**.**

At the outset, the Government contends that the evidence does not need to support a finding of a quid pro quo bribery to sustain a conviction under 18 U.S.C. § 666. In support of this argument, the Government principally relies on the Seventh Circuit's decision in United States v. Gee. There, the Seventh Circuit rejected the notion that in order to obtain a conviction under 18 U.S.C. § 666, the Government must present sufficient evidence for a jury to conclude that a specific act was taken in response to any specific payment. 432 F.3d 713, 714-15 (7th Cir. 2005). "It is enough," the Gee

court stated, "if someone corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, any thing of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.'" Id. (quoting 18 U.S.C. § 666(1)(B)). The Sixth Circuit has recently embraced the Gee court's interpretation of 18 U.S.C. § 666:

> By its terms, the statute [18 U.S.C. 666] does not require the government to prove that [the defendant] contemplated a specific act when he received the bribe; the text says nothing of a quid pro quo arrangement to sustain a conviction or otherwise: while a " quid pro quo of money for a specific ... act is sufficient to violate the statute," it is "not necessary." United States v. Gee, 432 F.3d 713, 714 (7th Cir.2005). Rather, it is enough if a defendant "corruptly solicits" "anything of value" with the "inten[t] to be influenced or rewarded in connection" with some transaction involving property or services worth $5000 or more. 18 U.S.C. § 666(a)(1)(B)."

United States v. Abbey, 560 F.3d 513, 520. (6th Cir.2009). Citing Gee and Abbey, the Government argues that Defendants' convictions on Counts 7 and 8 must be upheld if a rational jury could infer from the evidence at trial that Bryant sought out a pensionable salary at SOM in return for being influenced in the exercise of his official discretion, and conversely, that Gallagher offered to pay Bryant an SOM salary intending to influence Bryant in the performance of his duties as a New Jersey State Senator.

However, the issue of whether § 666 bribery requires proof of a quid pro quo remains unresolved in the Third Circuit. Recently, in United States v. Bornman, the Third Circuit declined to answer whether 18 U.S.C. § 666 requires proof of a quid pro quo as the defendant in that case did not raise the issue on appeal. 559 F.3d 150 (3d

22

Cir. 2009).  While the <u>Bornman</u> court did not address the issue, it did find that the defendant's § 666 bribery conviction should be sustained because the jury "would have been entitled to conclude that Bornman accepted something of value - i.e., the offer of employment - with the intent, <u>inter alia</u>, of having that relationship influence his remaining official actions."  <u>Id.</u>

The Court need not resolve whether <u>Abbey</u> or <u>Gee</u> are applicable in the case at bar or, alternatively, whether the Third Circuit requires a <u>quid pro quo</u> for § 666 bribery. This Court previously held that Counts 7 and 8 of the Indictment sufficiently alleged a <u>quid pro quo</u> <u>bribery</u>: "Count 7 clearly alleges a 'but for causal link between the quid, the SOM salary, and the quo, Bryant's conduct in transactions involving the state of New Jersey."  Indeed, this Court noted that "[t]he allegation that Bryant accepted the SOM salary 'intending to be influenced and rewarded' tracks the statutory language of 666(a)(1)(B)."  In accord with that finding, the Court charged the jury that in order to find that Defendants violated 18 U.S.C. § 666, it must find a quid pro quo bribery:

> Third: Under this statute, the government must prove a quid uo bribery, that is: with respect to Wayne Bryant, that Wayne Bryant corruptly accepted, agreed, to accept, solicited, or demanded salary payments and other financial benefits from UMDNJ/SOM, the quid; while intending to be influenced in taking favorable actions towards SOM in his capacity as a state legislator, the quo. With respect to R. Michael Gallagher, that R. Michael Gallagher corruptly gave, agreed to give, or offered salary payments and other financial benefits from UMDNJ/SOM, the quid; while intending to influence Wayne Bryant in taking favorable actions towards SOM in his capacity as a state legislator, the quo.

Thus, it was incumbent upon the Government to prove beyond a reasonable doubt that a <u>quid pro quo</u> bribery existed.  Here, as stated <u>supra</u>, the Government was able to

demonstrate that Defendants engaged in a quid pro quo bribery scheme to defraud the citizens of New Jersey of Bryant's honest services.  Thus, the Court finds that the evidence in the record could also support a finding of guilt as to Counts 7 and 8 as they are based on the bribery scheme alleged in Counts 1-6. At trial, the Government adduced evidence from which the jury could find that Bryant openly sought a job at SOM and that the nature of this employment revolved around his responsibilities and influence as a New Jersey State Senator.  Moreover, the evidence at trial would also permit a jury to find that Gallagher wanted to hire Bryant for a position in an effort to obtain additional SOM funding, and authorized that Bryant receive his $35,000 salary and a $5,000 bonus.

Nevertheless, Gallagher contends that his conviction on Count 8 should be overturned because the evidence demonstrates that Bryant's SOM job was "bona fide" and falls within the safe harbor provision of § 666(c).

### a. Safe Harbor Provision

The safe harbor provision reads: "This section does not apply to a bona fide salary. . .or other compensation paid. . .in the usual course of business."  18 U.S.C. § 666(c). This, however, is not the first time Gallagher has raised the argument that the safe harbor provision applies to Counts 7 and 8.  Previously, this Court denied that the conduct alleged in Counts 7 and 8 fell within the aforementioned provision because "[t]he salary payments at issue were allegedly paid to Bryant as the quid in a quid pro quo bribery arrangement with Gallagher" and "[s]ince the payments at issue were allegedly compensation for Bryant's undisclosed 'primary role' as a legislator on the

take. . . .it cannot be argued with a straight face that the payments were 'bona fide' salary paid in the 'usual course of business.'" Bryant, 556 F. Supp. 3d at 427.

Despite this ruling, Gallagher contends that the evidence introduced at trial clearly demonstrates that Bryant's SOM job and salary were "bona fide" as defined under the safe harbor provision.  This Court disagrees.  First, the Government was able to demonstrate that Bryant's primary duties at SOM were to secure additional state funding in his capacity as a State Senator. Whatever legitimate work Bryant may have done while employed at SOM and the evidence was scant, at best, as a Program Support Coordinator does not outweigh what the evidence at trial tends to show: that Bryant secured a salary at SOM in exchange for his influence as a State Senator. Certainly, the safe harbor provision does not insulate Defendants from criminal liability when the salary at issue is paid in the form of a bribe as it was alleged and proven here. United States v. Baldridge, 559 F.3d 1126, 1139 (10th Cir. 2009) (citing United States v. Cornier-Ortiz, 361 F.3d 29, 36 (1st Cir.2004))  ("Because this was not work for which he could have been paid by the County, the payment was not a bona fide wage paid in the usual course of business.").

Second, once this Court determined that the safe harbor provision did not apply as a matter of law, whether Bryant's salary was "bona fide" became a question of fact left to the jury to decide. See United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007); United States v. Dwyer, 238 Fed.Appx. 631, 647-48 (1st Cir.2007). That, of course, presupposes that the jury is instructed on the safe harbor provision and is charged accordingly. In the instant case, the issue of whether Bryant's SOM salary was "bona

fide" for the purposes of the safe harbor provision was never sent to the jury.  At trial, Gallagher had the opportunity to ask the Court to instruct the jury on the safe harbor provision; after much discussion, he chose not to do so.  It is inconceivable that this Court could revisit and ultimately throw out the jury's decision to convict Gallagher on Count 8 based on the safe harbor provision when, pursuant to Gallagher's request, it was not instructed to apply it.  That being said, there was sufficient evidence in the record for the jury to find that Bryant's SOM job was not bona fide.  Accordingly, Gallagher's Rule 29 and 33 Motions on Count 8 are denied.

### E. Counts 9-13 The Pension Counts

Bryant next argues that the Government failed to introduce sufficient evidence to sustain a conviction on Counts 9-13, which charged Bryant with fraudulently inflating his pension benefits.  As alleged in the Indictment, Bryant engaged in a scheme to defraud the New Jersey Division of Pensions and Benefits (the "Division") to obtain pension benefits "by means of materially false and fraudulent pretenses, representations and promises."  Bryant intended, the Government further alleged, to inflate his "high three," the average salary for a retiree's three highest paid years as a government employee or elected official used.  The "high three" is the formula used to calculate post-retirement benefits for government employees and elected officials. To inflate his "high three," Bryant actively sought out employment that qualified for the accrual of pension benefits, including his position at SOM and a position at GCBSS. However, in the course of doing so, Bryant misrepresented the work he was actually doing, obtaining benefits to which the Government charged he was not entitled.

26

Bryant proceeds with this argument on two grounds: (1) the evidence introduced is insufficient to sustain a finding that Bryant acted with the requisite mens rea; and (2) Bryant was not on notice that the alleged conduct that support these counts was unlawful.  The Court will discuss each in turn.

### a. Evidence at Trial was Sufficient to Sustain a Finding of Willfulness

Bryant initially challenges the sufficiency of the evidence with respect to his state of mind.   Bryant argues that in order to find him guilty of Counts 9-13, the Government would need to demonstrate beyond a reasonable doubt that he knew his conduct was unlawful.  The Government contends that the evidence presented at trial was sufficient to find that Bryant acted willfully in his scheme to fraudulently obtain pension benefits from the Division.

As stated supra, the evidence at trial could sustain a finding that the actual nature of Bryant's employment with SOM was unlawful.   Thus, it only follows, the Government proffers, that such public employment would not qualify for pensionable benefits.  However, whether Bryant's employment at SOM was unlawful does not necessarily satisfy the present inquiry. Bryant, 556 F. Supp. 2d at 434 ("Whether or not the Division would have ultimately denied Bryant his pension if it knew the facts alleged in the Indictment is beside the point if Bryant took actions to make sure the Division would not know those facts.") (emphasis in original).  Rather, the jury could find that Bryant willfully engaged in mail fraud if the evidence demonstrated that Bryant concealed the nature of his actual employment at SOM and GCBSS, i.e. his duties and the time he spent working on matters for SOM and GCBSS.  The record

27

amply supports this conclusion.

The Government demonstrated through Dr. Cook's testimony that Bryant actively sought pension-qualified employment from UMDNJ. Moreover, the evidence tends to show that if Bryant's actual responsibilities at SOM were revealed, he certainly would not have qualified for a pension or his $35,000 salary. Indeed, Crosbie, during his testimony, recalled a discussion he had with Gallagher, in which he stated that "[o]f course we had to give him three days. That's the way he would qualify for his pension." 6 T 148. Based on the record, the jury could find that Bryant had the intent to secure pensionable employment and salary at SOM and did so through fraudulent misrepresentations, including the true nature of the employment he would undertake at SOM and the amount of time he would spend in that capacity.

With respect to Bryant's employment at GCBSS, the Government presented testimony that Bryant was aware that his submissions of Attorney Time Accountability reports contained false information. Specifically, a former GCBSS member and Gloucester County Freeholder, Joseph Manganello, testified that he personally informed Bryant in 1996 that he was required to do the work himself and that appearances by associates of Bryant's law firm would not suffice:

> I told him that I had received complaints from union leadership that he was sending someone else to represent the board of social services at various hearings. I asked him – I informed him that it was a problem, that we had been receiving a lot of complaints generally concerning the attorneys. They had thought we had hired too many attorneys.

17 T 4. In fact, Manganello characterized such a practice as "a problem," one which Bryant assured him would not occur again. 17 T 4-6. Nevertheless, the Government

28

contends, and Bryant does not dispute, that associates from Bryant's law firm continued to make appearances before the GCBSS. It was also revealed at trial that over the years 2002-2006, Bryant performed 14.8 hours of work at GCBSS, a small fraction of the 3700 hours put in by Zeller & Bryant associates.  GTX6300a

The Government also introduced several time sheets Bryant was required to complete and submit to GCBSS payroll.  See e.g., GTX6213.  The time sheet includes a section for a GCBSS employee to enter the hours he or she worked, i.e. .7 or 1.5 hours,  followed by this sworn statement: "Employee Statement: I hereby submit that the above entries represent the hours I have worked in the listed work units and the other compensable hours that I have used during this pay period."  GTX6213.  Every time sheet introduced into evidence included time entries that Bryant supposedly worked and his signature.  See, e.g., GTX6213, 6214, 6215, 6216, 6217, 6218, 6219, 6220, 6221, 6222, 6223. More importantly, the evidence revealed that Bryant did not supervise Zeller & Bryant attorneys who were working on GCBSS matters.  Based on this evidence, the jury could infer that Bryant ignored Manganello's warning and proceeded to sign time-sheets that did not accurately reflect the work he was performing at GCBSS.  Certainly, such conduct could be construed as willful. Moreover, Bryant does not assert what exactly was lacking in the Government's case-in-chief that renders a finding of willfulness in this case improper under either Rule 29 or 33. Thus, this Court finds that the evidence is sufficient to support a finding that Bryant acted willfully with respect to Counts 9-13.

### b. Counts 9-13 are not Void for Vagueness

Bryant also argues that Counts 9-13 are void-for-vagueness, specifically that the pension fraud counts do not comport with "due process and fair notice."   In ruling on Bryant's Motion to Dismiss the Indictment, this Court rejected the void-for-vagueness challenge with respect to these Counts, finding that:

> because the elements of mail fraud do not require application of the standard that Bryant attacks as vague, at least with respect to the allegations pertaining to GCBSS and UMDNJ, Bryant's void for vagueness challenge fails. Again, the pertinent issue is not whether Bryant actually performed "little or no meaningful and legitimate work," but whether the Indictment adequately alleges that Bryant made "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension," Stackpole, 64 Fed. Appx. at 843 (quotations and citations omitted), regarding the nature of his employment in a scheme to defraud the Division.

Bryant, 556 F. Supp. 2d at 433. While the Court did find that the  Rutgers pension count of the Indictment was impermissibly vague as it provided no standard by which Bryant could gauge whether his conduct was criminal in nature, specifically whether the work he did for Rutgers was "substantial," the GCBSS and SOM counts made no such allegation and were not void-for-vagueness.  Id.  Nevertheless, the Court must still determine whether the record supports a conviction on the pension counts, which necessarily required the jury to find that Bryant made fraudulent misrepresentations to the Division in order to obtain pension benefits.

As this Court previously stated, a criminal charge is not void for vagueness if:

> it define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." . . .the more important aspect of [the] vagueness doctrine "is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement."

> Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

Kolender v. Lawson, 461 U.S. 352, 357-58 (1983) (citations omitted)).

The Government argues that Bryant was well aware that the work of associates at his law firm for GCBSS would not qualify as "creditable service" towards his pension and that such representations to the Division fraudulently obscured the true nature of his public employment with GCBSS. To further bolster this contention, the Government highlights evidence presented at trial, including the New Jersey Supreme Court's decision in Masse v. PERS, 87 N.J. 252, 255 (1981), in which the court held, inter alia, that when determining which service should be considered "creditable," "[i]t is self-evident that service must refer to the work performed and the responsibilities assumed by the employee for which he receives compensation. Thus, to be creditable service would require at least employee performance." In light of Masse and N.J.S.A. 43:15A-39, the Government argues that Bryant knew that work primarily done by associates at Zeller & Bryant could not be credited towards his pension and representations in his time sheets that he did the work were done so as to conceal this fact.

Whether or not Bryant personally did the work for GCBSS submitted on his time sheets is not seriously contested. The Government, through the introduction of documentary evidence, as well as the testimony of Zeller & Bryant attorneys, clearly demonstrated that Bryant did little of the work as represented to the Division. GTX6300a. At issue at this stage is whether the evidence, looked at in a light most

31

favorable to the Government, permits a jury to find that Bryant engaged in a scheme using the United States mail to fraudulently misrepresent the nature of his work at SOM and GCBSS in an effort to obtain additional pension benefits. Given the evidence highlighted by the Government, a rational fact finder could find as much. Accordingly, Bryant's Rule 29 and Rule 33 Motions are denied.

### D. Gallagher's Motion for New Trial

As mentioned above, Gallagher argues that according to Rule 33, he is entitled to a new trial given several trial errors that had a substantial influence on the jury's guilty verdict. The Court will discuss each of those alleged errors in turn.

### a. Government's Comment During its Summation

Initially, Gallagher contends that the Government, during its summation, made improper references to Gallagher's decision not to testify at trial when it stated that "Dr. Gallagher knew what Senator Bryant was up to. At the very least, they met on a monthly basis. It's going to be very hard for Dr. Gallagher to suggest – and the evidence shows Dr. Gallagher met with Wayne Bryant at least monthly." 11/12 at 35. This comment on his failure to testify, Gallagher argues, violated the Self-Incrimination Clause of the Fifth Amendment. In response, the Government asserts that the only  comment that could possibly trigger Fifth Amendment concerns, "It's going to be very hard for Dr. Gallagher to suggest" is an incomplete sentence which could hardly be construed as highlighting for the jury Gallagher's decision not to testify. The Government further argues that the sentence is completed with proper reference to what the evidence shows and not what Gallagher could have testified to

had he taken the stand.

The Fifth Amendment of the United States Constitution provides in part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury. . . .nor shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  As developed, the Self-Incrimination Clause of the Fifth Amendment prevents the prosecution or the court from referencing a defendant's decision not to testify.  Recognizing that "comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' Murphy v. Waterfront Comm., 378 U.S. 52, 55 (1964), which the Fifth Amendment outlaws," the Supreme Court has maintained that such comments are grievous constitutional errors that warrant a new trial. Griffin v. California, 380 U.S. 609, 614 (1965).  Which comments encroach on the Fifth Amendment, however, is not so clearly defined.  In Griffin, the Supreme Court found that the following language in a prosecutor's closing statement ran afoul of the Self-Incrimination Clause:

> 'The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.
>
> ***
>
> These things he has not seen fit to take the stand and deny or explain.
>
> And in the whole world, if anybody would know, this defendant would know.
>
> 'Essie Mae is dead, she can't tell you her side of the story. The defendant won't.'

380 U.S. at 614.  The Third Circuit has also weighed in, holding that "[a] remark is

33

directed to a defendant's silence when the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Brennan, 326 F.3d 176, 187 (3d Cir. 2003) (internal citations omitted).  Thus, statements made by the prosecution during summation that only suggest the defense has not contested a certain point or, similarly, that the record does  not contain specific evidence, without more, do not violate the Fifth Amendment. Id. (quoting Bontempo v. Fenton, 692 F.2d 954, 959 (3d Cir.1982)).

Viewed in context, the challenged comment reflects on the strength of Government's case and not on the fact that Gallagher chose not to testify in his own defense.[4]  To the contrary, in light of the remark that followed the  statement, which concerned the weight of the evidence, this excerpt of the Government' summation concerned the credibility and strength of the Government's evidence as to a particular point of contention, whether Gallagher had personal contact on a regular basis with Bryant during his employment at SOM.  Mere conjecture or argument about what Gallagher could and could not seriously argue based on the evidence as presented at trial does not implicate the Fifth Amendment.  Indeed, it cannot be seriously argued that this portion of the Government's summation could be construed as highlighting the fact that Gallagher did not testify. While the right not to testify in one's own defense is an indelible right afforded the greatest protection in our criminal justice

---

[4]Gallagher does not contend that the challenged statement improperly shifts the burden of proof.

34

system, it is not so easily offended by summation remarks that reflect on the strength of the Government's own case as to a particular point. Accordingly, the Court finds that Gallagher is not entitled to a new trial on these grounds.

### b. Erroneous View of Pension Eligibility

In addition, Gallagher challenges the Government's introduction of evidence which he argues improperly links to him an erroneous view of pension eligibility in PERS. At trial, Defendants contested the Government's assertion that in order for Bryant to qualify for credit towards his pension at SOM, he would need to be classified as a .6, or 22.5 hour a week, employee. See 15 T. Notwithstanding this disagreement, Gallagher's argument is without merit. The attribution of this view of pension eligibility to Gallagher, be it accurate or not, is demonstrative of Gallagher's state of mind. At trial, Prodehl testified that Gallagher himself was under the impression that Bryant needed three days to qualify for his pension, another piece of evidence that tends to show that Gallagher acted willfully. See supra. Whether Bryant needed .6 over .2 is of no moment.[5] The Court is satisfied that the Jury could infer from the evidence that Gallagher held this view and that his actions were that of an individual who knew his actions were unlawful. Accordingly, Gallagher's Rule 33 Motion for a New Trial on these grounds is denied.

## III. CONCLUSION

---

[5]While it is not an important issue with respect to Gallagher's state of mind, as stated supra, the fact that Bryant was a .6 employee was necessary to qualify him for a salary of $35,000, something the Government argues was essential to the arrangement between Defendants.

35

For the foregoing reasons, Defendants' Rule 29 and 33 Motions are denied.


Dated May 27, 2009                      /s/Freda L. Wolfson_____
                                        Freda L. Wolfson, U.S.D.J.

36